IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| HILARIA GRIGSBY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 5:17-CV-06048-DGK |
| ) | |
| AKAL SECURITY, INC., ) | |
| ) | |
| Defendant. ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises out of Plaintiff Hilaria Grigsby's ("Grigsby") employment with Defendant AKAL Security, Inc. ("AKAL"). Grigsby lost her position at AKAL after AKAL eliminated several positions in an effort to reduce costs. Grigsby claims AKAL discriminated against her based on her gender, race, and national origin when it selected her position to eliminate. Grigsby also claims she was paid less than a Caucasian male employee for the same job. Grigsby sued AKAL for violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Equal Pay Act, 29 U.S.C. § 206(d).

Now before the Court is Defendant's motion for summary judgment (Doc. 40). For the reasons set forth below, the Court GRANTS Defendant's motion.

### Undisputed Material Facts[1]

AKAL provides security-screening services at the Kansas City International Airport ("MCI") through a contract with the Transportation Security Administration ("TSA"). Prior to AKAL, FirstLine Transportation Security ("FirstLine") had the contract with MCI.

---

[1] The Court excluded asserted facts that were immaterial to the resolution of the pending motion, asserted facts that were not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has included reasonable inferences from material facts not in dispute and proposed facts the opposing party has not controverted properly.

Grigsby is a black female of Dominican nationality. She worked for FirstLine from November 2002 to February 2015 in various positions. Effective February 1, 2015, she was hired by AKAL as a Terminal Manager. Jacob Sledd ("Sledd"), a Caucasian male, was also hired by AKAL in February 2015 as a Terminal Manager.

AKAL took over the MCI contract effective March 1, 2015. The contract requires three essential positions be staffed at all times: Program Manager, Deputy Program Manager, and Training Manager. The Program Manager is the highest-ranking employee under the MCI contract and is responsible for all operations and management aspects of the contract. Under the MCI contract, AKAL has two groups of employees, operations and program management. Operations employees include various levels of security officers who work in the airport terminals and are responsible for passenger security screening work. Program management employees include the Program Manager, Deputy Program Manager, Training Manager, Terminal Managers, and other administrative and management positions. The office consisted of 22 people, 13 were female and at least two were African American. Grigsby notes that she was the only black female manager in the program management office. Creating and filling program management positions was left to AKAL's discretion after filling the three essential positions stated in the MCI contract.

The operations employees' salaries are billable to the MCI contract and, in effect, are paid by the TSA because they had been negotiated under the MCI contract. The program management employees' salaries are billable to the MCI contract up to the amount negotiated for under the MCI contract. Relevant to this case, the number of program management staff and their salaries had exceeded what had been negotiated for under the MCI contract, which meant that the pay for each program management employee had become an expense to AKAL.

When AKAL took over the MCI contract, Robert Ray ("Ray") was the Program Manager. In May 2015, David Welliver ("Welliver") was hired as the Deputy Program Manager. Welliver's salary was set through a negotiation with AKAL's president. Initially Welliver requested $90,000, but after a series of counter-offers, the two decided on $87,500 per year. The Deputy Program Manager before Welliver, a male, earned $80,000 in the position.

Ray created the position Director of Airport Operations, reporting to the Deputy Program Manager. Grigsby, who had been working as a Terminal Manager, applied for and received the Director of Airport Operations position. Ray offered Grigsby $65,000 per year for the position, and Grigsby responded that she was "expecting more" but she did not request a specific salary or attempt to negotiate a higher salary. Ray told Grigsby that the position was capped at $65,000 per year.

In January 2016, Ray left his position and Welliver was promoted to Program Manager. The MCI contract required the Deputy Program Manager position to be filled, and so Ray and Welliver[2] chose Grigsby as the interim Deputy Program Manager. In February 2016, Grigsby applied for and received the permanent Deputy Program Manager position. Initially Grigsby had reservations about applying for the position but after conversations with Ray and Welliver, she applied. Grigsby interviewed for the position with Welliver, Brian Beckwith ("Beckwith"), and Angela Robeson. Welliver stated he believed Grigsby was the best qualified person for the job and recommended her for the position.

Before she received the job offer from Beckwith, Welliver told Grigsby that she should think about a salary to ask for. He stated "You need to think about what you're going to ask for the position should you get it, you need to justify what you ask for the position should you get it,

---

[2] The parties dispute whether it was Ray who offered Grigsby the interim position or Welliver, or whether it was a joint decision. Resolving this conflict is immaterial to resolving the issues of this motion.

and make sure you don't overprice yourself." Plaintiff decided to ask for $85,000 after considering her salaries as a Terminal Manager and the Director of Airport Operations. She did not consult any industry publications to determine the market rate for the position. She did not know what Welliver had made in that position, nor the budgeted salary range. Grigsby stated that Welliver's advice not to "overprice herself" affected the salary she requested because she did not want to ask for more than what she should, however she also stated that she didn't feel Welliver's advice was problematic or concerning.

Beckwith called Grigsby to tell her she had been selected for the Deputy Program Manager position and asked what her salary requirements were. Grigsby asked for $85,000 and Beckwith accepted that offer. Grigsby earned $2,500 less per year as the Deputy Program Manager than Welliver had earned in that position.

With Grigsby in the Deputy Program Manager position, the Director of Airport Operations position was vacant. Sledd applied for and was selected as the Director of Airport Operations, effective April 10, 2016. Both Grigsby and Welliver interviewed Sledd for the position and both felt he was the most qualified person for the position. Sledd negotiated his salary for the Director of Airport Operations position with Welliver. Initially, Sledd asked for $75,000, but through negotiations his salary was set at $73,000. Sledd's salary was $8,000 more than Grigsby's salary was when she was the Director of Airport Operations.

Beginning in December 2016, Welliver began discussions with his supervisors about cost cutting measures within his department. While there was some focus on cost cutting in 2015, the conversations now turned to reducing payroll costs. Welliver announced to the senior management team of the MCI contract that he may have to eliminate or merge some positions within the program management office.

4

Case 5:17-cv-06048-DGK    Document 49    Filed 06/21/18    Page 4 of 14

Welliver was asked to eliminate eight people, however he selected four positions he could eliminate or combine with other positions. Welliver submitted his proposal to his supervisors, who approved the plan and presented it to the AKAL board of directors. Welliver's proposal included converting a full-time logistics specialist position into a half-time job, resulting in a cost savings of $21,500. As a result, the individual in this position, a male, worked part-time as a logistics specialist and part-time as a supervisor in the operations group. Welliver's proposal also included eliminating a trainer position, resulting in a cost savings of $52,000 per year. The individual in this position, a female, had been recently transferred from the operations group and because of Welliver's decision, she was moved back to her operations position. Welliver also proposed terminating one of the human resources specialists. This individual, a female, would have been terminated for performance reasons but Welliver's proposal included not backfilling her position. Instead, Welliver assigned her duties to other staff. Eliminating this position resulted in a cost savings of $41,600 per year. Welliver gave small pay raises to those taking on the additional work, $1,000 to $1,500 per year. Lastly, Welliver's proposal included combining the Director of Airport Operations and the Deputy Program Manager positions because the positions were nearly the same but with different titles. Welliver decided to terminate Grigsby's position because Grigsby was paid more than Sledd, resulting in the largest cost savings.

Grigsby's employment was terminated on January 26, 2017. Welliver met with Grigsby and gave her a letter that was prepared by AKAL's Director of Human Resources. The letter stated "Effective today, January 26, 2017, Akal Security releases you from employment as your position is being eliminated as part of ongoing restricting efforts."

5

Case 5:17-cv-06048-DGK   Document 49   Filed 06/21/18   Page 5 of 14

Sledd took over substantially all of Grigsby's Deputy Program Manager duties in addition to his Director of Airport Operations duties. On January 29, 2017, Sledd's title was changed to Deputy Program Manager because that position was one of the positions required under the MCI contract. In his role as Deputy Program Manager, Sledd was paid $75,400, $2,400 more than what he was paid in his role as Director of Airport Operations, and $9,600 less than what Grigsby was paid in that position.

At the time Grigsby was terminated AKAL had an open Terminal Manager position that was ultimately filled by Gabe Murphy ("Murphy"). Murphy worked for FirstLine from August 2004 through March 2015, as a security officer at MCI. In March 2015, a few weeks after AKAL took over the MCI contract, Murphy became the interim and then permanent logistics specialist. In May or June 2016, Murphy began filling in one day a week as a Terminal Manager. In September 2016, Murphy became an interim Terminal Manager on a full-time basis. Ultimately, Murphy applied for and received the open Terminal Manager position, effective February 2017.

At the meeting on January 26, 2017, where Grigsby's employment was terminated, she asked Welliver if she could apply for the open Terminal Manager position. Welliver responded, "We don't demote." Welliver testified that he did not consider the Terminal Manager position a viable option for Grigsby because Murphy was in the position on an interim basis and he had applied for the permanent position. Welliver later explained that he believed the Terminal Manager position would be inappropriate for Grigsby because the Terminal Managers report to Sledd, and for the last two years, Grigsby had been Sledd's supervisor. Grigsby also asked if there were any other positions available within the company and Welliver responded, "I'm not

6
Case 5:17-cv-06048-DGK   Document 49   Filed 06/21/18   Page 6 of 14

aware of it but you can submit your resume." While she is eligible for rehire with AKAL, Grigsby has not applied for any positions since she was terminated.

Grigsby complains that her termination was unfair for several reasons. First, she complains that her position wasn't really eliminated because Sledd ultimately was given her job title. Next, she complains that Welliver should have offered her the option of taking a pay cut instead of terminating her. Further, she states that she was treated unfairly because her resume was already on file with the company but Welliver told her she needed to submit a resume in order to be considered for any other available positions with the company.

Grigsby filed a five-count lawsuit alleging (1) race, national origin, and gender discrimination in violation of Title VII (Counts I, III, IV); (2) race discrimination in violation of 42 U.S.C. § 1981 (Count II); and (3) violations of the Equal Pay Act (Count V).

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party who moves for summary judgment bears the burden of showing there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must view the facts in light most favorable to the nonmoving party and allow the nonmoving party to benefit from all reasonable inferences to be drawn from the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986).

**Discussion**

**I.      Grigsby's discrimination claims fail as a matter of law.**

Grigsby claims her termination from AKAL was discriminatory on the bases of her race in violation of Title VII and 42 U.S.C. § 1981 (Counts I and II) and her national origin and gender in violation of Title VII (Counts III and IV). *See* Am. Compl. (Doc. 20).

The elements of discrimination under Title VII are: (1) membership in a protected class; (2) job performance that meets the employer's legitimate expectations; (3) adverse employment action; and (4) similarly situated employee outside the protected class was treated differently. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005). "The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 739 (8th Cir. 2013).

Grigsby does not allege any direct evidence of discrimination, thus the Court must analyze her claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Singletary*, 423 F.3d at 891. Under that framework, the plaintiff first must establish a prima facie case of race, national origin, and sex discrimination. *Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004). The defendant then must produce "a legitimate, non-discriminatory reason for the adverse employment action." *Id*. If the defendant meets this burden, the burden shifts back to the plaintiff to show that the articulated reason was a pretext for discrimination. *Id*. "To survive summary judgment, an employee must both discredit the employer's articulated reason and demonstrate the circumstances permit a reasonable inference of discriminatory animus." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014) (internal quotations omitted).

For purposes of this motion, AKAL does not dispute that Grigsby could establish a prima facie case of discrimination, but AKAL argues Grigsby's discrimination claims fail as a matter of law because she cannot show that AKAL's reason for terminating her was false or a pretext for discrimination.

The Court finds AKAL has established a legitimate, nondiscriminatory reason for the decision to terminate Grigsby's employment. The undisputed facts evidence that Grigsby was terminated as part of a cost cutting effort that affected four positions, her job was nearly identical to Sledd's position, and she was paid more than Sledd. There are no facts that would allow a fact finder to find that AKAL's reason for terminating Grigsby's position was false, or that would allow a fact finder to infer that the real reason Grigsby was terminated was because of her gender, race, or national origin.

Grigsby argues there is evidence demonstrating the decision to terminate her was a pretext for discrimination, the cost cutting reason AKAL gave for terminating her was untrue, and that discrimination more likely motivated AKAL's decision to terminate her. First, Grigsby states that Welliver lied to her, other AKAL employees, and AKAL contractors when he said her position had been eliminated. She points out that the position of Deputy Program Manager was not eliminated because Sledd was given the job title just two days after her termination. The Court finds while AKAL could have done a better job at communicating that Grigsby's own position had been eliminated and not the Deputy Program Manager role, a fact finder could not find Welliver's phrasing amounts to a falsehood and that the real reason for terminating Grigsby was discriminatory.

Second, Grigsby argues the reason given for her termination was false because Welliver lied to her when he said there were no managerial positions were open, when in fact, the

Terminal Manager position, later filled by Murphy, was open. The undisputed facts do not support Grigsby's argument. Grigsby testified in her deposition that she asked Welliver if she could apply for the Terminal Manager position and that he responded, "We don't demote," not that she asked if there were any managerial positions open. Further, she testified that she asked Welliver if there were any open positions and Welliver responded "I'm not aware of it but you can submit your resume." Thus, the Court cannot find there are any disputed facts that AKAL's reason for terminating Grigsby was false.

Third, Grigsby argues AKAL acted with discriminatory animus because Welliver did not ask Grigsby if she would be willing to accept less money for the combined Deputy Program Manager-Director of Airport Operations position. Grigsby states that she told Welliver that she would be willing to do the job for less money. Grigsby does not cite to any law that requires a company to first offer an employee a pay cut prior to terminating them for cost cutting reasons. Grigsby made $12,000 more than Sledd, and their roles were nearly identical, making Welliver's business decision to terminate Grigsby over Sledd a reasonable one. *See McDonnel Douglas Corp.*, 63 F.3d at 781 ("the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.").

Fourth, Grigsby argues Welliver's budget cuts only negatively affected the pay of female employees. Grigsby supports her argument by pointing to the human resources specialist who was terminated for performance reasons and the trainer who was transferred to her previous position and as a result, lost a few thousand dollars in salary. Grigsby also points to the part-timer logistics coordinator and states that the individual in that role did not want his salary

reduced, so he agreed to take the job in addition to his other supervisory job. Grigsby's argument is unavailing. First, it ignores that the human resources position was not backfilled. Whether the individual in that position was terminated as part of cost cutting or for performance reasons is irrelevant that the position remained vacant and the duties were assigned to other employees. Her argument also ignores that three female associates actually received raises when they took on the human resources work. Thus, there are no undisputed facts that would allow a fact finder to infer AKAL's real reason for terminating Grigsby was discriminatory.

Finally, Grigsby argues the pay differential between her salary and her male counterparts is evidence of discrimination. Grigsby states that in her role as Deputy Program Manager she was paid $2,500 (three percent) less than Welliver was paid in that position, and that Sledd was paid $8,000 more than she was in the Director of Airport Operations role. Grigsby argues that Welliver was solely responsible in the decision to pay Sledd $8,000 more, told her not to "overprice" herself when negotiating her salary for the Deputy Program Manager position, and the decision to terminate her. As discussed more fully below in § II, these facts do not allow a fact finder to conclude that AKAL's reason for terminating Grigsby was false or a pretext for discrimination. The pay difference between Grigsby and Welliver in the Deputy Program Manager role is irrelevant because different decision makers were involved, Grigsby's pay was set with Beckwith and Welliver's pay was set with AKAL's president. Further, Welliver set Sledd's pay in the combined Deputy Project Manager and Director of Airport Operations at $9,600 less than what Grigsby was making in the Deputy Project Manager role only. The undisputed facts do not support a finding that AKAL's stated reason for terminating Grigsby was false or a pretext for discrimination.

11

Case 5:17-cv-06048-DGK    Document 49    Filed 06/21/18    Page 11 of 14

Considering all of Grigsby's arguments there are no disputed facts that would permit a fact finder to conclude that AKAL's reason for eliminating Grigsby's employment was not for cost cutting purposes but rather based on Grigsby's gender, race, or national origin. Considering Grigsby's arguments collectively, they are slightly more persuasive; however, collectively all the undisputed facts still fall short of what is necessary to refute that AKAL's reason for terminating Grigsby was for a non-discriminatory reason. Accordingly, AKAL's motion for summary judgment on Counts I, II, III, and IV is granted.

## II. Grigsby's equal pay claim fails as a matter of law.

Grigsby alleges two violations of the Equal Pay Act ("EPA"). First, Grigsby claims the $2,500 discrepancy between her and Welliver's salaries as the Deputy Program Manager was discriminatory. Second, Grigsby claims the $8,000 discrepancy between her and Sledd's salaries as the Director of Airport Operations was discriminatory. *See* Am. Compl. (Count V).

Under the EPA, "a plaintiff must establish a prima facie case by showing that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and work performed under similar conditions." *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2002). If the plaintiff makes this showing, the burden shifts to the defendant to prove one of the EPA's four affirmative defenses applies. *Horner v. Mary Institute*, 613 F.2d 706, 713 (8th Cir. 1980). "The last of the statutory affirmative defenses set forth in the EPA is a catch-all provision that excuses pay discrepancies 'based on any other factor other than sex.'" *Taylor*, 321 F.3d at 715. "[N]egotiations leading to a comparator's higher salary, or a demand for a specific salary, may establish a valid 'factor other than sex' defense to an unequal pay claim." *Ewald v. Royal Norwegian Embassy*, 82 F. Supp. 3d 871, 947 (D. Minn. 2014) (citing *Horner*, 613 F.2d at 714 (holding that the differential in salary between plaintiff and her

comparator was the result of negotiations, which is sufficient to rebut plaintiff's prima facie case of pay discrimination)).

For purposes of this motion, AKAL does not dispute that Grigsby could establish a prima facie case under the EPA, but argues Grigsby's claims fail because the undisputed facts demonstrate the salary discrepancies are the result of negotiations, and thus, a factor other than gender.

> **A.     The difference in Grigsby's and Welliver's salaries as Deputy Program Manager was set through salary negotiations.**

The undisputed facts state the individual who held the Deputy Program Manager before Welliver made $80,000, Welliver earned $87,500, and Grigsby earned $85,000 in the Deputy Program Manager role. Welliver's salary was set through negotiations with AKAL's president, and Grigsby's salary was set when Beckwith accepted her suggested salary. Given these undisputed facts, Welliver and Grigsby's salaries were set through negotiations, a factor other than gender.

> **B.     The difference in Grigsby's and Sledd's salaries as Director of Airport Operations was set through salary negotiations and Sledd being the most qualified candidate.**

The undisputed facts state Ray hired Grigsby for the Director of Airport Operations job and set her salary at $65,000. While Grigsby stated she "was expecting more," she did not ask for a higher salary or attempt to negotiate. Both Grigsby and Welliver interviewed Sledd for the Director of Airport Operations position and both agreed he was the most qualified person for the position. Sledd negotiated his salary with Welliver and after a back and forth, they agreed to $73,000. Grigsby stated when Sledd accepted the position that the salary was capped at $65,000. However, Welliver told Grigsby he could justify the higher salary to his supervisors because Sledd was the most qualified candidate. *See Horner*, 613 F.2d at 714 (holding the employer

13

Case 5:17-cv-06048-DGK     Document 49     Filed 06/21/18     Page 13 of 14

rebutted any possible prima facie case by proving the male's "experience and ability made him the best person available for the job and because a higher salary was necessary to hire him. The differential was based on a factor other than sex."). Here, there are no facts which would allow a fact finder to find that AKAL's decision to pay Sledd more than Grigsby in the Director of Airport Operations position was based on gender because his salary was set through negotiations and he was the best available person for the job, necessitating a higher pay.

## Conclusion

Defendant's motion for summary judgment (Doc. 40) is GRANTED.

**IT IS SO ORDERED.**

Date:  June 21, 2018              /s/ Greg Kays
                                                            GREG KAYS, CHIEF JUDGE
                                                            UNITED STATES DISTRICT COURT